STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

94 CVS 04489

96 NCB 103

| | |
|---|---|
| JAMES E. BYERS, WILLIAM J. BYERS, BILL GARDNER, JOHN A. KENNEDY, J. GORDON SCOTT, III, HAROLD K. STALLCUP, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>R.E. CARPENTER, JR., DR. Y.H. EAKER, TILLMAN K. MOSS, ALLEN H. PAINTER, JOHN W. PERKINS, FRED A. WILKE, CENTURA BANKS, INC. and CENTURA BANK,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ORDER

{1} THIS CAUSE was heard before the Honorable Ben F. Tennille, Special Superior Court Judge for Complex Business Cases, presiding, on January 30, 1998, on plaintiffs' Petition for Attorneys' Fees and Expenses. The plaintiffs were present and were represented by Robert B. Glenn, Jr. of Glenn, Mills and Fisher, P.A. and Michael Calhoun of Gulley and Calhoun. Defendants Centura Banks, Inc. and Centura Bank were represented by David Dreifus of Poyner & Spruill, LLP. The individual defendants were represented by John S. Arrowood of James, McElroy & Diehl, P.A. The Court has considered the Petition, affidavits and other supporting documentation, the presentation of counsel and the record in this action, and makes the following findings of fact and conclusions of law and enters the following order.

FINDINGS OF FACT

{2} 1. On September 16, 1993 the eligible voting members of First Savings Bank

of Forest City, SSB ("First Savings") voted to approve a proposed Conversion/Merger, pursuant to which First Savings was converted from a state chartered mutual savings bank to a state chartered stock owned savings bank and simultaneously merged into Centura.

{3} 2. On October 14, 1993, the Administrator of the North Carolina Savings Institutions Division ("the Administrator") approved the September 16, 1993 vote, approved the conversion of First Savings from a state chartered mutual savings bank to a state chartered stock owned savings bank, and approved completion of the conversion/merger with Centura in accordance with the Plan of Stock Conversion and Acquisition Agreement (the entire transaction is hereinafter referred to as "the Conversion/Merger").

{4} 3. The attorneys for the individual plaintiffs and the plaintiff class entered into a Contract of Employment with the individual plaintiffs as class representatives in October 1993. The Contract provided that the attorneys will petition the Court for an award of attorneys' fees if they are successful in the prosecution of this action. Thereafter, the attorneys undertook to represent the individual plaintiffs as representatives of the class in the above captioned civil action.

{5} 4. On November 19, 1993, Plaintiffs filed a Petition for a Contested Case Hearing with the North Carolina Savings Institutions Division ("the SID") seeking to have the Banking Commission reverse the Administrator's October 14, 1993 approval of the Conversion/Merger ("the Contested Case Proceeding").

{6} 5. On April 13, 1994, the Commission, acting through the Administrator, denied Plaintiffs' Petition for a Contested Case Hearing.

{7} 6. On May 13, 1994, Plaintiffs filed a joint petition for judicial review of the final decision of the SID and a civil action in Wake County Superior Court styled James E. Byers, William J. Byers, Bill Gardner, John A. Kennedy, J. Gordon Scott, J. Gordon Scott, III, and Harold K. Stallcup, on behalf of themselves and all others similarly situated, Plaintiffs. v. R. E. Carpenter, Jr., Dr. Y.H. Eaker, Tillman K. Moss, Allen H. Painter, John W. Perkins, Fred A. Wilkie, Centura Banks, Inc., Centura Bank, and North Carolina Savings Institutions Division, Defendants, File No. 94 CVS 04489 ("the Civil Action").

{8} 7. Thereafter, Defendants moved to dismiss the complaint. On March 2, 1995, after briefing and oral argument by the parties, the Superior Court denied Defendants' motion. The Court also severed Plaintiffs' claims against the North Carolina Savings Institutions Division from Plaintiffs' claims against the other Defendants and separated the claims against SID into Wake County Superior Court File No. 94 CVS 04489A ("the Judicial Review Proceeding").

{9} 8. On October 31, 1995, Judge Knox Jenkins remanded the Judicial Review Proceeding to the SID for the purpose of conducting a hearing on the Petition for a Contested Case Hearing.

{10} 9. On March 4, 1996, the Civil Action was certified as a class action.

{11} 10. On or about March 31, 1996, the Civil Action was designated an exceptional case pursuant to Rule 2.1 of the General Rules of Practice and assigned to the undersigned Judge.

{12} 11. On October 10, 1996, the Defendants moved for summary judgment. The motion of the Defendants and the response of the Plaintiffs were extensively briefed by both parties in initial briefs, letter briefs following the hearing, and a supplemental brief by the plaintiffs following additional discovery. The Court is thoroughly familiar with the legal and factual issues in the case and the work performed by the attorneys for their clients.

{13} 12. On August 11-13, 1997, the Administrator of the SID conducted a hearing on the matters set forth in the Petition for a Contested Case Hearing.

{14} 13. This action has been vigorously litigated by the parties over the past four years. Cross motions for summary judgment are presently pending before the Court which raise complex issues of law, many of which are issues of first impression in North Carolina.

{15} 14. On October 10 and 11, 1997, the parties engaged in mediation proceedings with the Honorable Justice James Exum and have advised the Court that they desire to resolve fully and forever all differences among them and to settle and compromise all disputes, claims, causes of action or other matters relating in any way to the Conversion/Merger, that were or could have been asserted in the Contested Case Proceeding, the Judicial Review Proceeding, or the Civil Action.

{16} 15. The named plaintiffs have actively participated in this action, attending court hearings, responding to discovery, participating in depositions, and regularly consulting with their attorneys. The

named plaintiffs strongly support and recommend the approval of the petition for attorneys fees.

<u>Analysis of Market Rates for Complex Litigation.</u>

{17} 16. The attorneys have submitted the affidavit of William Diehl, the lead counsel for the individual defendants wherein Mr. Diehl affirms that he charges $400 per hour for legal services in complex litigation. The attorneys have submitted the affidavit of Jeffrey Davis, an attorney practicing with Moore and Van Allen, specializing in complex litigation, affirming that he charges $280 per hour for legal services rendered in complex litigation. The firm of Glenn, Mills and Fisher, P.A. has submitted an affidavit stating that it would charge an hourly rate of between $200 - $225 per hour for providing legal services in a case such as the above captioned civil action. The firm of Gulley and Calhoun has submitted affidavits stating that it would charge an hourly rate of $175-$225 per hour for providing legal services in a case such as the above captioned civil action. The Court has also reviewed an order entered by the Honorable Howard Manning in <u>Smith et al. v. State of North Carolina,</u> No. 95 CVS 6715 (Wake County) wherein Judge Manning finds that the market rate for litigation in complex litigation is approximately $265 per hour for experienced trial attorneys.

{18} 17. The Court finds that the reasonable hourly rate for trial attorneys with the reputation and experience of the attorneys representing the plaintiffs in this action is between $200 and $250 per hour on a noncontingent fee basis. The Court has determined that the hours for law clerks in North Carolina are compensated at approximately $45 per hour.

<u>Analysis of the hours performed by the attorneys for the plaintiffs</u>

{19} 18. The attorneys have submitted time records with a summary of the hours of the attorneys in representing the plaintiffs in the above-captioned civil action, demonstrating that the attorneys expended the following hours over the last 4 years for Robert B. Glenn, Jr. - 1,946.35; William S. Mills - 244.30; Stewart W. Fisher - 440.40; Michael D. Calhoun and Wilbur P. Gulley - 1,822.05. In addition, a law clerk, Sarah Winslow, worked exclusively on this action during the summer of 1997 and provided 590.25 hours of work on this case.

{20} 19. The attorneys have offered affidavits outlining the steps required to complete the distribution of the settlement proceeds and close the class. Some of the anticipated steps include, but are not limited to, verifying the addresses of all the class members; computing their interest in the settlement; managing the preparation and distribution of the settlement checks; responding to numerous questions posed by the 2000 class members, including, but not limited to, the check amounts, proper disbursements in the case of joint accounts, deceased class members and minors; and final accounting required with the Court. The attorneys estimate that 200 hours of attorney time will be required to complete the closing of the class action and the Court finds that this is a reasonable estimate.

<u>Factors considered in a fee determination based on a lodestar multiple</u>

{21} 20. The North Carolina State Bar Rules set out factors to be considered in determining the reasonableness of attorneys fees, including the following:

    a. <u>The Time and Labor Required </u>- Rule 1.5(b)(1) (formerly Rule 2.6(b)(1))

(1) <u>Nature of the Claims for</u><br><u>Relief</u>

{22} This action was filed by the named plaintiffs, individually and as class representatives to recover the consideration paid by Centura to the individual directors and officers of First Savings, who, Plaintiffs alleged, benefited unjustly from the conversion/merger as a result of their breach of fiduciary duties to the members of First Savings, or, in the alternative, to set aside the conversion/merger of First Savings Bank of Forest City, SSB into Centura Bank that occurred in October 1993. The class consists of all members of

First Savings.

{23} The plaintiffs alleged that the Directors and officers of First Savings engaged in a four-year program to, first, convert First Federal Savings and Loan, a federally chartered savings and loan, to First Savings Bank of Forest City, SSB, a state savings bank, in order to avoid federal regulations and supervision, and, second, to merge First Savings into Centura, with substantial payments going to the directors and officers. Plaintiffs further allege that Centura conspired with the directors and officers by paying them in excess of 50% of the benefits from the conversion/merger transaction, or approximately $5,000,000. During the four-year period which was the subject of inquiry, First Savings was transformed from a federal savings and loan under the supervision of the Office of Thrift Supervision to a state savings bank under the supervision of the Savings Institutions Division.

{24} Plaintiffs' counsel were compelled to investigate and understand the various transactions and course of conduct, and to marshal the evidence to prove these claims. Also, because the advice of the attorneys, financial advisors and consultants employed by the Board was relied upon by the officers and directors as a defense, the actions of the attorneys, financial advisors and consultants were, by necessity, inquired into, and evidence was marshaled to rebut this defense. Also, the actions of the directors and officers of the corporation had to be examined, in light of the regulatory schemes applicable to federal savings and loans and to state savings banks. The final transaction which resulted in the conversion and merger of First Savings was the subject of lengthy and detailed disclosures in proxy statements, prospectus, and other documentation which required review, understanding and evaluation of this material, in light of the law surrounding proxy solicitations.

{25} The nature of the claims against the directors and officers of First Savings and Centura necessitated extensive financial analysis of First Federal and First Savings, of the compensation of directors and officers, and of the general statistical performance of savings and loans in North Carolina. The defendants relied on 10 other conversion/merger transactions which took place in North Carolina during the same period of time as comparable transactions. This analysis was designed to show that the consideration paid by Centura was reasonable, and that the actions of the officers and directors was consistent with the actions of the directors and officers of at least 10 other savings and loans. As a result of this defense, the Plaintiffs' counsel was required to become intimately familiar with these other transactions and the financial terms of these transactions. Also, the Defendants relied on statistics from the national market for savings and loans, which required the Plaintiffs' counsel to review and understand this financial information.

(2) Litigation Process

{26} Because the conversion/merger which is the subject of this civil action was required to be approved by the Savings Institutions Division of the Department of Commerce and by the Banking Commission, the Plaintiffs were legally required to exhaust their administrative remedies by asking for relief from these two agencies. This necessitated the preparation and filing of petitions in these two agencies, and with the Office of Administrative Hearings. These petitions resulted in hearings before the Savings Institutions Division and the Banking Commission early in the process, with denials of the plaintiffs' rights to proceed on a number of procedural grounds. These petitions also resulted in procedural maneuvering before the Office of Hearings and Appeals, with eventual deferral to the Savings Institutions Division. By necessity, the plaintiffs' counsel had to become expert with the rules and regulations of the Savings Institutions Division and the Banking Commission.

{27} Having been denied substantive hearings before these administrative agencies, the plaintiffs were compelled to file a civil action. The plaintiffs instituted a civil action in the Wake County Superior Court, raising common law claims for breach of fiduciary duty, unjust enrichment and conspiracy by the individual officers and directors and Centura Bank. Also, in a separate cause of action, the plaintiffs filed an administrative appeal from the denial of a right to a substantive hearing before the Savings Institutions Division. In response to the plaintiffs' Complaint, the Savings Institutions Division filed Motions to

Dismiss pursuant to NCGS §1A-1, Rule 12(b)(1), (2) and (6) for lack of jurisdiction and failure to state a claim for relief. Defendant Centura filed Motions to Dismiss under NCGS §1A-1, Rule 21 for improper joinder of the Savings Institutions Division. These motions were extensively briefed and argued. The Motions to Dismiss were denied. Simultaneously therewith, the Superior Court severed the administrative appeal from the civil action, and the case proceeded as two separate cases.

### (a) Administrative proceeding

{28} Subsequently, the administrative appeal was briefed and argued in the Superior Court. An Order was entered remanding the case to the Savings Institutions Division for a hearing of the merits of the plaintiffs' claims. This Order was the subject of a Writ of Certiorari and an Appeal to the North Carolina Court of Appeals. The plaintiffs filed Motions to Dismiss the appeals and deny the writs. Following briefing on the appeals and writs, the Appeal was dismissed as being interlocutory. Byers v. N. C. Savings Institutions Div., 474 S.E.2d 404 (1996).

{29} Subsequently, the Savings Institutions Division held a hearing in August 1997 for three days. Prior to the hearing, both parties filed lengthy briefs. The parties also submitted, in lieu of testimony, hundreds of pages of excerpts of deposition testimony. At the hearing, the plaintiffs called 7 lay witnesses and 2 expert witnesses, and offered over 250 exhibits. The defendants called the General Counsel for Centura and 2 expert witnesses, and offered over 200 exhibits. Following the hearing, the parties filed additional briefs requested by the Administrator. The final decision by the SID was pending when the case was settled.

### (b) Civil action

{30} Following severance, the defendants filed a Motion to Stay the civil action, pending the conclusion of the administrative appeal. This motion was denied, and the parties proceeded forward to class certification. After extensive briefing, the Motion for Class Certificaion was argued, and an Order was entered certifying the class constituting all members of First Savings. At the time of the conversion/merger, there were 2,000 members of First Savings. Counsel had to prepare a Notice to the class, which was the subject of considerable debate, and required a subsequent hearing before the trial judge. After the approval of the Notice, Plaintiffs' counsel mailed the Notices to the class members. Following the mailing, counsel had to monitor the opt-outs from the class, the numerous changes of addresses, and correspondence and calls from many of the class members. Administration of the class aspects of the case has consumed considerable time and expense.

### (c) Discovery

{31} When the two cases were severed, it was agreed that the parties would engage in joint discovery for the administrative action and the civil action. Given the complexity of this civil action, the parties engaged in extensive and rigorous discovery. The Defendants produced in excess of 20,000 pages of documents requested by the Plaintiffs from First Savings and Centura pursuant to several requests for production. The Plaintiffs also responded to several requests for production served by the defendants. The Plaintiffs deposed 21 witnesses, many for multiple days, including the individual directors and officers of First Savings, 4 officers from Centura, 4 attorneys from the law firm of Brooks, Pierce, McLendon, Humphrey & Leonard who handled the conversion/merger, the attorney for the Savings Institutions Division, an attorney for First Savings who assisted in the conversion from federal charter to state charter, the President of the proxy solicitation firm who assisted First Savings, and the financial consultant and appraiser who represented First Savings throughout the conversion/merger transaction. In addition, Plaintiffs' attorneys defended 28 depositions taken by defense counsel, including the individual Plaintiffs and other witnesses from the class. In addition to document production, the parties propounded extensive and multiple sets of interrogatories and requests for admissions.

{32} There were numerous discovery disputes, in light of the confidential nature of the documents requested and information sought by Plaintiffs' counsel. Also, there were two Motions to Compel that were briefed and argued regarding several other discovery issues.

{33} Due to the financial, accounting, appraisal, regulatory, proxy solicitation and other specialized issues in the case, the parties identified four expert witnesses who were to appear as witnesses in the trial of this civil action. Pursuant to a Discovery Order, the parties disclosed information about the experts in compliance with the requirements of the Federal Rules of Civil Procedure. The plaintiffs deposed the two experts identified by the defendants, which required travel to Washington, DC. Plaintiffs' counsel defended the depositions taken by the defendants of the two experts identified by the plaintiffs. Also, the defendants raised the advice of counsel and other experts as a defense to the actions of the plaintiffs. The plaintiffs were required to investigate the advice of financial consultants, attorneys and appraisers, and depose these individuals in anticipation of their appearance to provide expert testimony.

(d) Motions for Summary Judgment

{34} It was the position of the parties that Summary Judgment was appropriate as to several issues in the case. Therefore, the parties prepared for Summary Judgment as if for a hearing on the merits. The briefs of the parties were involved and lengthy. The parties offered over 300 exhibits, selections from 30 depositions, and over 30 affidavits from both parties. The hearing was involved and protracted. Following the hearing, the parties submitted supplemental letter briefs and additional exhibits, in light of arguments. Following additional discovery, the plaintiffs were permitted to file an additional supplemental brief in support of their arguments in favor of Summary Judgment. Submissions by the parties on the Summary Judgment motions filled five file drawers. The Court's ruling on Summary Judgment was pending when the parties settled the case.

(e) Mediation

{35} After the hearing before the Savings Institution Division, the parties started discussion about a mutually agreeable resolution of this case. The plaintiffs had offered to settle the case in early 1996. There was no counteroffer until the fall of 1997. After initial discussions the parties agreed to a mediation to be held in Charlotte for two days. Retired Chief Justice James Exum presided. At the end of the second day, the parties were able to reach an agreement to settle the case for $3,500.000.

b. The Novelty and Difficulty of the Questions Involved - Rule 1.5 (b)(1) (formerly Rule 2.6(b)(1))

(1) "Ownership" Status of Class Members

{36} It has been held throughout the nation that members of a mutual savings and loan have no ownership interest in the net worth of the institution. The defendants contended that the plaintiff class had no interest in the benefits flowing to the directors, and, therefore, did not have standing to oppose the transaction. Thus, the plaintiffs had the initial burden of establishing a right or claim for relief for breach of fiduciary duties by the directors and officers in accepting substantial benefits arising out of the conversion/merger which were not otherwise accessible to the plaintiff class.

(2) Regulatory Approval Preempting the Plaintiffs' Claims

{37} The transaction which is the subject of this civil action was one of several consummated in North Carolina in the early 1990's. The transaction was the same in all respects as the other regulated transactions approved by the Savings Institutions Division and Banking Commission, except that the directors in this case were able to provide benefits to the members and the community of approximately $3,500,000, which exceeded the member and community benefits provided in other conversion/mergers. Centura's acquisition of First Savings received all required regulatory approvals from the Securities and Exchange Commission, the Federal Deposit Insurance Corporation and the Federal Reserve.

{38} Because the North Carolina General Assembly had placed jurisdiction in the Savings Institutions Division and charged that body with regulation of conversion/mergers of state savings banks, the defendants argued strenuously that the Administrator's decision preempted a civil action. In order to preserve all potential remedies, the plaintiffs petitioned the Savings Institutions Division to provide a

hearing on the merits of the conversion/merger and the proceedings followed therein. The right to this hearing was denied by the Savings Institutions Division on the grounds that the plaintiffs did not have standing to contest the decisions of the Savings Institutions Division. This necessitated an appeal to the Superior Court under the Administrative Procedures Act.

## (3) Administrative Jurisdiction

{39} The defendants contended that, upon the conversion/merger, the Savings Institutions Division lost all jurisdiction over First Savings because it had merged into a bank which was outside the jurisdiction of the Savings Institutions Division. The defendants also contended that Centura and the individual directors and officers were not parties to the administrative proceeding, and, therefore, the SID could not provide any remedy as against the named defendants. Also, the defendants contended that the plaintiffs were not "aggrieved parties," and, thus, did not have standing to obtain a contested case hearing under the APA. The defendants contended that the merger of First Savings into Centura did not affect the persons or employment of the petitioners, because they did not have a property interest in challenging the agency approval. The defendants' arguments were supported by the majority of the courts that have considered the rights of members of mutual savings and loans, and concluded that there are no "property" rights in the bank, other than the right to have a return of their money in their accounts, and an agreed-upon interest rate. It was undisputed that the conversion/merger did not adversely affect those rights of the members.

## (4) Exhaustion of administrative remedies

{40} The defendants contended that the petitioners had not properly perfected their rights to a hearing within the appropriate time limit. Notice was published of the proposed conversion/merger on July 30, 1993, and provided for a 10 day comment period. The defendants contended that, notice having been properly published as required by law, the petitioners were required to file a objections to the transaction within this time period and before the conversion/merger was consummated. The Defendants also argued that, consistent with a fundamental sense of fairness, once the conversion/merger was consummated, significant business and financial steps had been taken to merge First Savings into Centura Bank, and, therefore, the transaction should not be set aside. Plaintiffs were required by law to exhaust their administrative remedies before recovering on many of their claims.

## (5) Conspiracy

{41} The defendant Centura Bank contended that it could not be found to have engaged in a conspiracy with the directors and officers of First Savings to breach a fiduciary duty. Centura argued that it merely engaged in a business transaction, as one of three bidders, which transaction was approved and coordinated by Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P. and Trident Financial, Inc., the most well-respected attorneys and financial consultants working in the field of savings and loan conversion/mergers in North Carolina. Further, Centura argued that the entire transaction was more beneficial to members than any other transaction of its kind in North Carolina, and received approvals of five regulatory bodies responsible for regulating the transaction.

## (6) Conclusion

{42} The Defendants' arguments had strong support in the existing federal and state case law and regulations. Therefore, it was incumbent on the plaintiffs to put forth new and untested theories in support of their claims, which the plaintiffs' counsel did. Many of the theories of the plaintiffs' counsel were ones of first impression, not only in North Carolina, but also in the country. Notwithstanding the lack of precedent, Plaintiffs' counsel were hopeful of a favorable result in this litigation. The hurdles which Plaintiffs would have had to overcome were high, if not insurmountable. The settlement obtained was an exceptional one.

c. The Skill Requisite to Perform the Legal Services Properly - Rule 1.5(b)(1) (formerly Rule 2.6(b)(1))

{43} Representing the named plaintiffs and the class in this civil action required a high level of skill and knowledge in a wide variety of substantive and procedural areas. The case required skill and knowledge in the management of a class action, proceedings before an administrative agency, in the Civil Superior Court, and at the appellate level. Counsel was required to become familiar with and work effectively with sophisticated financial, banking and appraisal information. Also, counsel had to become familiar with and work with the law of proxy solicitations under several different regulatory schemes.

{44} Counsel also had to litigate this matter in these various forums against very experienced and competent counsel, who were expert in this type of litigation. The resources available to the defendants were substantial, and far in excess of those available to the plaintiffs, requiring of the plaintiffs' counsel thoughtful and careful use of time and resources in the prosecution of this matter. This case was litigated in two separate forums. One hearing was held before the Administrator of the Savings Institutions Division without a jury, requiring skill in nonjury matters. The other case was to be tried before a jury, requiring skill in jury matters. The case also involved extensive briefing at the Superior Court, before the Savings Institution Division and at the appellate level.

d. <u>The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude employment by the lawyer-</u> Rule l.5(b)(2) (formerly 2.6(b)(2))

{45} Over the last 4 years, the firm of Glenn, Mills and Fisher has expended in excess of 3,000 hours and the firm of Gulley and Calhoun has expended in excess of 1,700 hours in the prosecution of this action. The five attorneys that comprise the two law firms have worked diligently in the prosecution of this case. It was anticipated that, in light of the potential result and the adverse publicity for Centura and the individual directors, this litigation would be hard fought. It was also anticipated that, since the claims arose in Rutherford County, the case would require considerable travel. Also, it was anticipated that Centura would employ national experts to serve in the trial of this case, which would require additional travel. Also, it was anticipated that there would be significant resources required to be advanced by the Plaintiffs' firms to properly litigate this case in two forums. It was discussed with the clients during the time that the clients were deciding whether to proceed forward that this would be a hard fought campaign that would consume substantial involvement by the attorneys.

e. <u>The Fee Customarily Charged in the Same Locality for Similar Legal Services -</u>Rule 1.5(b)(3) (formerly Rule 2.6(b)(3))

{46} It is customary in the state of North Carolina for plaintiff's counsel to be compensated in cases involving civil tort claims by a contingency fee. Traditionally, if the attorney is successful in recovering money for the client, a percentage is applied to the gross amount recovered for the client. The percentages to be applied vary based on the stage of the process at which the case is resolved. Typical fee arrangements provide that the attorney is paid 25% if the case is settled prior to filing a civil action, 33 1/3% after the filing of a civil action and 40% after the case is appealed to the appellate court. The percentage fee is paid in addition to any expenses that the attorney has incurred on behalf of the client.

f. <u>The Amount Involved and the Results Obtained -</u> Rule 1.5(b)(1) (formerly 2.6(b)(4))

{47} In this conversion/merger, the primary direct benefit to most class members was a one percent increase in their deposits (provided they left the deposit with Centura for at least one year). This benefit totaled slightly more than $300,000. Approximately 150 class members also purchased Centura stock at a 15% discount. Finally, Centura made a contribution to the First Savings/Centura Bank Foundation in the amount of $1,500,000.

{48} Under the present plan proposed by the plaintiffs, approximately $2,300,000 will be paid to the members of the class. This payment is far more than payments to members of a mutual bank in other conversion/mergers in North Carolina. Given the great uncertainty of the actions by the Savings Institutions Division, the significant potential for a Summary Judgment in favor of the defendants on all or part of the claims, and the uncertainty of a jury verdict, the settlement of this action for $3,50,000 to be

paid by Centura Bank to the class was an extraordinary result.

g. <u>Time Limitations Imposed by the Client or by the Circumstances</u> - Rule 1.5(b)(5) (formerly Rule 2.6(b)(5))

{49} Many of the directors and the individual Plaintiffs are senior citizens. The plaintiffs' counsel felt significant pressure in bringing this case to trial as soon as possible, in order to have the benefit of the named Plaintiffs appearing and giving testimony, and in calling the individual directors for cross-examination.

h. <u>The Nature and Length of the Professional Relationship with the Client</u> - Rule 1.5(b)(6) (formerly Rule 2.6(b)(6))

{50} The attorneys and the clients did not have a professional relationship prior to this case. In all likelihood, the attorney-client relationship will end with this case, due to the distance from Rutherford County to Durham County and the areas of specialization of the attorneys.

i <u>The Experience, Reputation and Ability of the Lawyers Performing the Services</u> - Rule 1.5(b)(7) (formerly Rule 2.6(b)(7))

{51} All of the attorneys representing the plaintiffs are attorneys licensed to practice law in the State of North Carolina. The average years in practice for the 5 attorneys is 18 years. Each of the attorneys brought individual expertise to the case. The firm of Glenn, Mills and Fisher, P.A. has extensive experience in the preparation and trial of complex civil litigation. Michael Calhoun has specialized in the prosecution of class actions. Wilbur P. Gulley is a state senator and has specialized in administrative matters, banking and legislative matters. The attorneys submitted affidavits from respected attorneys from the state of North Carolina known to this Court, including James Fuller, Norman Smith, Walter Baker, Gray Wilson and Jeffrey Davis, affirming the experience, quality and reputations of the Plaintiffs' attorneys.

j. <u>Whether the Fee is Fixed or Contingent</u> - Rule 1.5(b)(8) (formerly Rule 2.6(b)(8))

{52} The fee in this case was contingent on a successful outcome, and was contingent as to the amount of money to be paid, subject to the Court's approval. As discussed above, there were numerous legal hurdles for the Plaintiffs to overcome to obtain a recovery in this case. They had to obtain certification of the plaintiff class. On the merits, an adverse decision by the SID and/or this Court was a definite risk. Based upon prior transactions on a national and state level, there was a substantial risk that the Savings Institutions Division would not order the payment of any additional proceeds to the members of First Savings, the class of plaintiffs. In this event, there would be no benefits which would be the subject of a contingency fee to be paid to plaintiffs' counsel. Furthermore, if the prior decision by the Superior Court, that the petitioners had standing to request and be granted a hearing before the administrative agency, had been reversed, the Court could have dismissed the plaintiffs' claims for failure to exhaust administrative remedies. Also, if the class certification had been reversed by the Court of Appeals, the individual claims of the named plaintiffs would have been insignificant, and would have generated virtually no attorneys' fees for the plaintiffs' counsel.

{53} If the case had been tried to a jury, there would have been a substantial risk that a jury would award nothing to the class members. The directors and officers had served an average of 25 years each for the institution. They were in charge when the institution became ranked as one of the strongest savings and loans in the country, and the first in North Carolina. They are all prominent members of the community, who were following the advice of the most well-respected attorneys and advisors in the field of conversion/mergers. The average age of the individual defendants was approximately 75 years old. The subject transaction was approved by the Savings Institution Division and all other regulatory agencies required to review the transaction. The transaction was then submitted to a vote of the members, after detailed disclosures, and it was overwhelmingly approved.

{54} 21. The attorneys have submitted affidavits from James Fuller from Raleigh, Norman Smith from Greensboro, Walter Baker from High Point, Gray Wilson from Winston-Salem and Jeffrey Davis from Charlotte. These attorneys have considerable experience in litigation in complex cases such as the above captioned action. They also represent a cross section of qualified attorneys from the plaintiff and defense bar. These attorneys state in their affidavits that the attorneys fee requested in Plaintiffs' fee petition are reasonable.

{55} 22. The Plaintiffs' attorneys have reasonably expended $96,758.37 in expenses to date in the prosecution of this action and will incur future expenses in the administration of the class settlement.

## CONCLUSIONS OF LAW

{56} 1. Plaintiffs have created a common fund for the benefit of the former members of First Savings, and Plaintiffs' counsel are entitled to an award of reasonable attorneys fees and expenses for their efforts which created this fund.

{57} 2. The Court has discretion in determining the appropriate method for determining appropriate fees based on the facts of this particular case. Using either the lodestar method, a percentage of fund, or a hybrid approach, the Court concludes that the attorneys fees requested by Plaintiffs' counsel are reasonable.

{58} 3. Using the lodestar method, the Court finds that Plaintiffs' counsel have reasonably expended 4,453.1 hours of attorney time and 590.25 hours of law clerk time to date in the prosecution of this case, and that they will expend at least another 200 hours of attorney time in the administration of the class settlement. Using an hourly rate of $225.00 per hour for this attorney time and $45 per hour for the law clerk time produces a base amount of $1,073,509. A multiplier of this base amount is appropriate due to the contingency of success, the outstanding result obtained by plaintiffs, the large time demands of this case and the other factors set out above in the findings of fact. A reasonable multiplier based on these factors would be 2 to 4. Applying this multiplier to the base amount produces an attorney fee substantially in excess of that requested by Plaintiffs' counsel.

{59} 4. Under the percentage of fund approach the Court also concludes that the attorney fees requested by Plaintiffs' counsel are reasonable. Plaintiffs achieved an excellent result in a hard fought case that had substantial obstacles for Plaintiffs to overcome. The amount recovered by Plaintiffs exceeds that obtained in other conversion/merger cases. The instant case was vigorously and skillfully defended by Defendants' counsel, who marshaled substantial legal and factual arguments against Plaintiffs' claims. This required Plaintiffs to expend the many hours described above to produce the settlement that will benefit the Plaintiff class. Considering these factors, the attorneys fees requested by Plaintiffs' counsel are reasonable.

{60} 5. The Court concludes that under a hybrid approach the attorney fees requested by Plaintiffs' counsel are reasonable. Under this approach the Court weighs both the result produced by a lodestar analysis and the result produced by a percentage of fund analysis. Since the fees requested by Plaintiffs' counsel are reasonable under both of these methods, it follows that they are per force reasonable under a hybrid analysis.

{61} 6. The attorneys fees and expenses requested by Plaintiffs' counsel are reasonable and proper and should be ordered paid out of the common fund created by Plaintiffs for the members of the class.

{62} WHEREFORE, IT IS ORDERED ADJUDGED AND DECREED, that Plaintiffs' attorneys shall recover from the class settlement fund attorneys fees in the amount of $1,166,666.66 and expenses to date in the amount of $96,758.37.

This the 30th day of January, 1998.